USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 3, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WILLIAM S. SHANAHAN and ANTARES, LLC,  :
                                       :
                  Plaintiffs,          :     03 Civ. 3496 (PAC)
                                       :
     - against -                       :
                                       :
MAURICE VALLAT, JAMES                  :     OPINION & ORDER
COLLINS-TAYLOR, LOUIS BOWEN, ACL       :
NOMINEES LTD., ACL HOLDINGS LIMITED,   :
and ACL ASIA LIMITED,                  :
                                       :
                  Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JAMES COLLINS-TAYLOR, LOUIS BOWEN,     :
ACL NOMINEES LTD., ACL HOLDINGS        :
LIMITED, and ACL ASIA LIMITED,         :
                                       :
                  Third-Party Plaintiffs, :
                                       :
     -against-                         :
                                       :
ROSE-MARIE FOX,                        :
                                       :
                  Third-Party Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs William S. Shanahan and Antares, LLC ("Antares") claim that Maurice Vallat, Louis Bowen, James Collins-Taylor, and three corporations—ACL Nominees Ltd., ACL Holdings Limited, and ACL Asia Limited[1]—violated the securities fraud provisions of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, and state common law. Additionally, Plaintiffs allege securities fraud in violation of

---

[1] For the purposes of this Opinion & Order, ACL Nominees Ltd., ACL Holdings Limited, and ACL Asia Limited will be referred to collectively as "ACL."

Section 20(a) of the Exchange Act against defendants Bowen and Collins-Taylor.[2] Bowen, Collins-Taylor and ACL (collectively the "Certain Defendants"), in turn, bring a third-party contribution claim against Third-Party Defendant Rose-Marie Fox. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) to dismiss Plaintiffs' Amended Complaint in its entirety on the grounds that none of the alleged violations caused the loss which Plaintiffs incurred.[3] For the reasons discussed below, Defendants' motion is GRANTED, and Certain Defendants' contribution claim against Third-Party Defendant Fox is consequently DISMISSED.

## BACKGROUND

**I.    Facts**

A description of the parties and a summary of the facts as alleged in the Amended Complaint are set forth in Judge Michael B. Mukasey's Opinion & Order, Shanahan v. Vallat, No. 03 Civ. 3496 (MBM), 2004 WL 2937805, at *1–3 (S.D.N.Y. Dec. 19, 2004), familiarity with which is assumed. Additional facts and citations to the record are added where appropriate for the discussion that follows.

Plaintiff William S. Shanahan is a skilled and sophisticated businessman, who served as the president of Colgate-Palmolive Co., Inc. from 1992 to 2005. (Certain Defs.' Statement of Undisputed Facts ("CDSUF") ¶¶ 1, 4). Between 2000 and 2002, Shanahan made substantial investments in Phoenix Telecommunications Ltd. ("Phoenix") both on his own behalf and on

---

[2] Plaintiffs' Amended Complaint also contained allegations of securities fraud in violation of Section 12(2) of the Securities Act of 1933 against all Defendants, as well as allegations of securities fraud in violation of Section 20(a) of the Exchange Act against Vallat and ACL. Judge Michael B. Mukasey dismissed these claims with prejudice. See Shanahan v. Vallat, No. 03 Civ. 3496 (MBM), 2004 WL 2937805, at *6–7 (S.D.N.Y. Dec. 19, 2004).
[3] The Certain Defendants submitted a memorandum of law in support of the present motion for summary judgment on August 27, 2007. In moving for summary judgment, Defendant Vallat relies on the arguments made by Certain Defendants both in their papers and in oral argument before this Court on March 4, 2008.

2

behalf of Antares, a company Shanahan formed as a vehicle for his Phoenix investments.[4] Phoenix was incorporated on June 10, 1998; it was initially formed in order to finance ventures in the Chinese telecommunications market, in particular the development of a one-way paging network. (See Am. Compl. ¶ 3.)

Between 2000 and 2002, Plaintiffs invested over $5 million in Phoenix. (See id. ¶¶ 21, 26, 28–29.) Shanahan claims that in making these investments he relied on Phoenix's financial statements for the years 1998, 1999, and 2000. The 1998 and 1999 financial statements had been prepared by the Certain Defendants[5] and provided to Shanahan by Vallat, who served on Phoenix's Board of Directors from 1998 through 2002. Vallat prepared the 2000 financial statements with the help of an accountant.

During this period, Vallat claimed to have accrued tens of thousands of dollars in unpaid salary, but Vallat's claims were never identified as liabilities in any financial statements upon which Plaintiffs relied in making their decisions to invest in Phoenix. In January 2003, after having been fired from Phoenix's Board of Directors, Vallat brought a claim against Phoenix in a Hong Kong labor tribunal ("the Tribunal") for unpaid salary for the years 2000, 2001, and 2002. At the direction of the Tribunal, Vallat amended his claims to allege additional unpaid salary for the years 1998 and 1999. Although it ultimately disallowed his 1998 and 1999 claims, the Tribunal awarded Vallat more than $76,000 in back wages for the years 2000, 2001, and 2002.

The Tribunal's award to Vallat exceeded Phoenix's liquid assets. Phoenix was unable to raise money to continue operating in the wake of Vallat's victory in Hong Kong, and Plaintiffs' investments in the company's stock were rendered "essentially worthless." (Pls.' Mem. in Opp'n

---

[4] Shanahan owned 99% of Antares, while his wife, Third-Party Defendant Fox, owned the remaining 1%.
[5] Each of the Certain Defendants had a relationship with Phoenix. ACL served as Phoenix's financial advisor. Bowen was the founder and Managing Director of ACL, and was the supervisor of Collins-Taylor, who served as Executive Director of ACL with primary responsibility for ACL's relationship with Phoenix. Collins-Taylor also served as a Director of Phoenix from its incorporation through May 2001.

to Certain Defs.' Motion for Summ. Judg. ("Pl. Mem.") at 12.) Payment of the award to Vallat prevented Phoenix, Plaintiffs say, from exploring business opportunities other than those related to the Chinese one-way paging market in which it had been involved up to that point. (See id. at 4.)

In December 2002, an appraiser, RSM Nelson Wheeler Corporate Advisory Services, was retained by Phoenix in order to prepare a financial report (the "Nelson Wheeler Report") for the company and its shareholders. The Report concluded that the number of wireless paging subscribers in China had declined to approximately 25 million in July 2002, down from approximately 44 million in July 2000 and approximately 75 million at the end of 1999. (Nelson Wheeler Report at p. 25 para. 4.2 (Decl. of Sudwiti Chanda ("Chanda Decl.") Ex. 23).) The Nelson Wheeler Report indicated that the decrease in the number of wireless paging subscribers was attributable, at least in part, to the increasing availability and popularity of mobile phones in China. (Id. at p. 25 para. 4.3.)

## II. Plaintiffs' Claims and the Third-Party Contribution Claim

Although Plaintiffs' Amended Complaint alleges a host of improprieties at Phoenix,[6] the centerpiece of its Section 10(b) and Rule 10b-5 securities fraud and common law fraud claims is that Vallat's accrued unpaid salary should have been disclosed in Phoenix's 1998, 1999, and 2000 financial statements. If only this information been included in the financial statements provided to them by the Defendants, Plaintiffs contend, they would have never invested in Phoenix. Moreover, Plaintiffs argue that because the Tribunal's award to Vallat exceeded Phoenix's liquid assets, the very liabilities for accrued unpaid salary that did not appear on

---

[6] Among these are claims that, in 2001, outside auditors found Phoenix's books to be "incomplete, highly redacted and in overall bad shape"; that ACL had commingled Phoenix's funds in a general account with those of other, unrelated corporations; and that Vallat had been stealing from Phoenix and had unlawfully acquired 1.5 million shares of Phoenix stock.

4

Phoenix's financial statements were ultimately the reason for the company's demise. Put another way, Plaintiffs argue that it was Vallat's claim for compensation that caused the whole Phoenix operation to collapse. (See Transcript of Oral Argument ("O.A. Tr."), March 4, 2008, at 14:20-22.)

Plaintiffs also assert control person liability under Section 20(a) of the Exchange Act against Defendants Bowen and Collins-Taylor. According to Plaintiffs, the control exerted by Bowen and Collins-Taylor included "causing [Phoenix] to issue [its] 1998 and 1999 fraudulent financial statements . . . in order to induce Shanahan, and later Antares, LLC, to provide capital to Phoenix and keep that Company solvent." (Am. Compl. ¶¶ 57–58.) Plaintiffs claim that the omissions and misrepresentations in the financial statements "left Phoenix on the verge of liquidation because of the Award to Maurice Vallat in the Hong Kong Proceedings." (Am. Compl. ¶ 58.)

Certain Defendants, in turn, assert a third-party contribution claim against Shanahan's wife and business partner, Rose-Marie Fox. (Certain Defs.' Amended Answer and Third-Party Claim ¶¶ 76–100.) The Certain Defendants claim that Fox solicited the subject investments from her husband in an attempt to gain control of Phoenix for herself and her husband, and that Shanahan relied on the representations of Fox, and not the Certain Defendants, in making his investments. (Id. ¶¶ 88–99.)

### III. Legal Standard for Summary Judgment under Rule 56

Summary judgment may be granted if the pleadings demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

5

Inc., 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

The moving party initially bears the burden of demonstrating that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this showing is made, the nonmoving party may not rely solely on "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S.Ct. 1769, 1776 (2007) (citing Fed. R. Civ. P. 56(c)).

## DISCUSSION

**IV.    Securities Fraud Claims under Section 10(b) and Rule 10b-5**

Claims for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 require that the plaintiff establish five elements: "the defendant, (1) in connection with the purchase or sale of securities, (2) made a materially false statement or omitted a material fact, (3) with scienter, and (4) that the plaintiff's reliance on the defendant's action (5) caused injury to the plaintiff." In re Salomon Smith Barney Mutual Fund Fees Litig., 441 F. Supp. 2d 579, 587 (S.D.N.Y. 2006) (quoting Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003) (citations omitted)); see also Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999)

6

(citation omitted) (laying out the same formula for stating a claim under Rule 10b-5).

"Private securities fraud actions are available 'not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" City of Sterling Heights Police and Fire Retirement System v. Abbey Nat., 423 F. Supp. 2d 348, 357 (S.D.N.Y. 2006) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005)). A "private plaintiff who claims securities fraud must prove that the defendant's fraud caused the economic loss." Dura Pharms., 544 U.S. at 338. It is well-established that, in order to carry this burden of proof, "a securities-fraud plaintiff must prove both transaction and loss causation." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quotation and citations omitted). Transaction causation requires that "but for the claimed misrepresentation or omissions, the plaintiff would not have entered into the detrimental securities transaction." Lentell, 395 F.3d at 172 (quotation and citation omitted). Loss causation requires a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." In re Salomon Smith Barney, 441 F. Supp. 2d at 588.

In the present case, then, Plaintiffs must demonstrate (1) that Defendants' alleged misstatements or omissions were the "but for" cause of their investments in Phoenix (transaction causation); and (2) that these same misstatements or omissions ultimately caused Plaintiffs' economic harm (loss causation). On the assumption that Plaintiffs would not have made their investments in Phoenix but for the misrepresentations contained in the financial statements, the Court turns to whether Plaintiffs have demonstrated that the loss they experienced was due to those misrepresentations.

Loss causation is the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff," In re Salomon Smith Barney, 441 F. Supp. 2d at 588, or the

7

"causal connection between the material misrepresentation and the loss." Dura Pharms., 544 U.S. at 342. Thus, "[t]o establish loss causation, a plaintiff must show that the economic harm that is suffered <u>occurred as a result of</u> the alleged misrepresentations." Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992).

The concept of loss causation is similar to the doctrine of proximate cause. See Merrill Lynch & Co. v. Allegheny Energy, 500 F.3d 171, 183 (2d Cir. 2007). A defendant's alleged "misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." In re Merrill Lynch & Co. Research Reports Sec. Litig., No. 07 Civ. 6677 (JFK), 2008 WL 2019680 at *8 (S.D.N.Y. May 8, 2008) (quoting Lentell, 396 F.3d at 173).

"[A] plaintiff must allege . . . that the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell, 296 F.3d at 173. In other words, the loss must be caused by the "materialization of the concealed risk." Id.

Thus, "the Second Circuit has made clear that in order '[t]o plead loss causation, the complainant must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.'" In re Initial Pub. Offering Secs. Litig., 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) (quoting Lentell, 396 F.3d at 175). If the relationship between the misstatements or omissions and plaintiffs' loss "is sufficiently direct, loss causation is established; but if the connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged

8

misstatements or omissions and the harm actually suffered, a fraud claim will not lie.'" Lentell, 296 F.3d at 174 (citations omitted).

Here, Plaintiffs claim that the subject of Defendants' fraudulent omission, i.e. the back wages owed to Vallat that were not disclosed in Phoenix's 1998, 1999, and 2000 financial statements, caused the loss of their multi-million dollar investment in Phoenix. Defendants, Plaintiffs claim, effectively concealed the risk that Phoenix might be held liable for Vallat's accrued unpaid wages—when this risk "materialized" by means of the Tribunal's award of roughly $76,000 to Vallat, Plaintiffs suffered their loss. Again, the crux of Plaintiffs' argument is that Vallat's claim for compensation caused Phoenix to collapse.

Defendants' counter-argument is simple and direct: Defendants' omission of Vallat's back wages from Phoenix's financial statements did not cause Plaintiffs' loss. That loss was due to "adverse market conditions in China." (Mem. in Support of Certain Defs.' Motion for Summ. Judg. ("Def. Mem.") at 14.) Plaintiffs cannot demonstrate loss causation because the materialization of Defendants' alleged misrepresentations had nothing to do with the sharp decline in the market for one-way pagers in China. (See id. at 17.)

The parties do not dispute that by 2002 the Chinese paging market was experiencing a steep decline as a result of competition from cellular telephones and other new technologies. China Unicom, for example, was a major Chinese paging company that met the same fate as Phoenix following the collapse of the paging market in China. According to an article published in the *Shanghai Daily News* on April 4, 2005: "China Unicom's paging business has reached its peak in 2000 when the [number of its subscribers] jumped 12 million to reach 45 million. But after that, the rapid growth of mobile telecom and Little Smart businesses has soon wiped out the paging market. In 2002, more than 100 paging firms nationwide were forced out of business."

9

(CDSUF ¶ 110.)

"[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospects that the plaintiff's loss was caused by the fraud decreases," First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994). Plaintiff's claim fails when it cannot be proven that the loss was caused by the alleged misstatements or omissions as opposed to the intervening cause. See Lentell, 396 F.3d at 174; see also Bastian v. Petren Resources Group, 892 F.2d 680, 685 (7th Cir. 1990) ("If the defendants' oil and gas ventures failed not because of the personal shortcomings that the defendants concealed but because of industry-wide phenomena that destroyed all or most such ventures, then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages.").

On the facts before this Court, no reasonable jury could determine that, with respect to the Chinese one-way paging market, Plaintiffs' losses were due to anything other than "industry-wide phenomena that destroyed all or most" companies whose business activities resembled those of Phoenix. Bastian, 892 F.2d at 685. Whatever its plans for the future—and those will be discussed below—the record is clear that, between 1998 and 2002, Phoenix's involvement in the Chinese telecommunications industry was overwhelmingly, if not entirely, in the one-way paging market. The *Shanghai Daily News* account of China Unicom's demise echoes the information contained in the Nelson Wheeler Report indicating that the number of wireless paging subscribers in China was in freefall between 2000 and July 2002. There was a clear and discernable explanation for the decline: users were switching to cellular telephones and other new technologies. By the time the Tribunal made the award to Vallat in 2003 which Phoenix did not have the assets to pay, the bottom had already dropped out of the Chinese one-way paging

market. There is no factual basis for claiming that the "materialization" of Vallat's claims led to this situation. Phoenix could not earn a return on Plaintiffs' investments because investments in one-way pagers were destroyed by market forces.

Plaintiffs have another "for want of a nail, a shoe was lost" argument. They argue that Phoenix's purpose as a telecommunications company was always to move out of one-way paging and into other technologies. "As Defendant Vallat admitted, the main purpose of Phoenix was to 'go from paging, one way paging, to something else,' as technology developed and the market changed." (Pl. Mem. at 21.) Under Plaintiffs' version, Phoenix cannot be characterized as simply a "Chinese Paging Business" for the purpose of the instant claims. (See id. at 4, 21 fn. 10.) Instead, by viewing the company—and Plaintiffs' investments in the company—in terms of broader, long-term objectives in the Chinese telecommunications market, Plaintiffs claim it becomes clear that the Hong Kong litigation and the Tribunal's award to Vallat:

> left Phoenix in dire financial straits and unable to raise further funds to support evolving applications of its technology, its infrastructure and nationwide frequency and business licenses. This impact was far greater and more immediate than the impact of pager market in China….At the very least, once the scope of Phoenix's operations is understood, it becomes clear the loss that resulted from Mr. Vallat's back pay claims, namely Phoenix's collapse, was within the zone of risk created by omitting the liabilities.

(Id. at 21–22.)

This argument is nonsense. Having failed in the paging market for reasons wholly unrelated to any misstatements that were made, Plaintiffs must advance more than mere speculation in order to overcome the showing that their loss was attributable to an intervening cause. See, e.g., Fragrance Express Dot Com, Inc. v. Standard & Poor's Corp., 314 F. Supp. 2d. 189, 194 (S.D.N.Y. 2003). In Fragrance Express, the Court held that "plaintiff's entirely speculative theory of causation" was overcome by defendant's presentation of facts indicating

11

that "the decline in plaintiff's stock price [was] rooted in the underlying weakness of plaintiff's venture." Id. The Court further held that "Defendant's argument on causation can be considered on summary judgment, because 'a convincing presentation by the moving party' cannot be overcome by 'the mere possibility that a factual dispute may exist." Id. (citation omitted). This standard is in keeping with the proposition that plaintiffs must rely upon more than "[c]onclusory allegations, conjecture, and speculation" in order to overcome a motion for summary judgment. Niagara Mohawk Power, 315 F.3d at 175.

The question here is whether Plaintiffs have provided more than speculation for their theory that, absent the misstatements and Vallat's claims, Phoenix would have been able to expand into other areas of the Chinese telecommunications market, thereby maintaining the value of Plaintiffs' investments. The answer is clearly not.

First, the evidence in the record indicates that, while Phoenix may have had the goal of expanding into other areas of the Chinese telecommunications industry, such an expansion was predicated on its gaining a secure foothold in the paging market—rather than failing in that market and, in desperation, trying another. Plaintiffs rely on a 1999 Phoenix Executive Summary ("the Summary") for their argument that Phoenix's true business purpose was to expand into multiple areas of the telecommunications market. (Pl. Opp. at 5.) Yet the Summary, in relevant part, reads:

> Phoenix believes that nation-wide satellite paging is an effective entry
> point to advanced telecom services in the PRC [People's Republic of China].
> After the Network is fully operational and the subscriber base has reached
> critical mass, Phoenix plans to diversify into other forms of communications
> and in other countries.

(Chanda Decl. Ex. 27.) Of course, the subscriber base for Phoenix's paging network never reached critical mass. Instead it collapsed as the market shifted to cellular telephones and other

12

advanced technologies.

Even assuming that the establishment of a fully operational paging network was not a prerequisite for the operational expansions Phoenix aspired to make, there is no evidence that Phoenix ever actually expanded beyond the one-way paging market—thus rendering claims that such an expansion was in the cards wholly speculative. There is only one reference to an attempt by Phoenix to expand or diversify its business. In 2003, Phoenix began supplying some hotels and karaoke bars with sports and business information. But this "trick" never got off the ground because the SARS epidemic—which Third-Party Defendant Fox described as a "real business tragedy"—closed down the hotels and karaoke bars in which the new project was being beta tested. (See Decl. of Ridley Whitaker, Aug. 24, 2007 ("Whitaker Decl.") Ex. 2 at 98:15-22.) There is no evidence that, absent Vallat's claims, this venture would have succeeded, or that even it if had, it could have served as a platform for achieving anything of business significance.

Plaintiffs further argue that "Phoenix was a start-up, there were a number of prior occasions when it survived funding shortfalls by raising additional investments . . . . The liability for Vallat made it that much harder to attract additional capital this time." (Pl. Mem. at 23.) This is entirely speculative and conclusory.

In sum, Plaintiffs cannot demonstrate that the misstatements about Vallat's unpaid salary and the Tribunal's award of back pay caused the loss they experienced.[7] Their investments in Phoenix—a start-up venture investing in a collapsing market with no real plans for expansion of its business—failed due to market conditions, not fraudulent misstatements or omissions. As such, they cannot make out a claim of loss causation sufficient to sustain their Section 10(b) and

---

[7] The Court recognizes that, during an October 3, 2006 hearing in this case, it stated that the case presented "all kinds of factual issues." (Pl. Mem. at 1.) Upon further review of the record, however, it is clear that whatever factual issues the case presents are insufficient to allow a rational finder of fact to conclude that Plaintiffs have demonstrated loss causation.

13

Rule 10b-5 claims.

**V.      Common Law Fraud Claim**

Defendants' motion for summary judgment on this claim must be granted. For the reasons stated above, Plaintiffs cannot establish the requisite loss causation in order to sustain their securities fraud claims. Consequently, the common law fraud claim is likewise deficient. See Revak v. SEC Realty Corp., 18 F.3d 81, 89–90 (2d Cir. 1994); see also Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison, 955 F. Supp. 248, 258 (S.D.N.Y. 1997).

**VI.     Control Liability Claim under Section 20(a) against Bowen and Collins-Taylor**

Since there is no securities fraud liability, there can be no control liability under Section 20(a). Accordingly, the claims against Bowen and Collins-Taylor are dismissed. See SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472–73 (2d Cir. 1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person . . . ."); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1132 (2d Cir. 1994) (finding no error in the district court's dismissal of Section 20(a) secondary liability claims where "the primary violation asserted by [plaintiff was] not adequately pleaded").

**VII.    Third-Party Contribution Claim against Fox**

The third-party contribution claim against Fox is contingent upon the Certain Defendants being held liable for the losses incurred by the Plaintiffs. As summary judgment is granted on all the claims against all Defendants, this third-party claim is hereby dismissed.

**CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is GRANTED

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED and the third-party claim is DISMISSED. The Clerk of the Court is directed to close this case.

Dated: New York, New York
       October 3, 2008

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge

Copies E-mailed / Mailed / Faxed
By Chambers